IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| WALTER HENNING | * | |
| Plaintiff | * | |
| v | * | Civil Action No. JFM-15-3881 |
| WARDEN LAURA ARMSTEAD, et al. | * | |
| Defendant | * | |
| | *** | |

## MEMORANDUM

Defendants Damon Fayall and Jill Danzillo[1] filed a motion to dismiss or in the alternative for summary judgment in response to the above-entitled civil rights complaint. ECF 13. Plaintiff was advised of his right to file an opposition response and of the consequences of failing to do so (ECF 15), but has filed nothing further in the case.[2] The court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow, Defendants' motion, construed as a motion for summary judgment, shall be granted.

### Background

At the time plaintiff filed the complaint, and at all times relevant to the claims raised, he was an inmate committed to the custody of the Maryland Department of Public Safety and Correctional Services ("DPSCS") and assigned to Patuxent Institution and Baltimore City Correctional Center ("BCCC"). On or about February 28, 2016, plaintiff was released from custody. Plaintiff names as defendants Warden Laura Armstead, Damen Fayllon, Jill Danzillo,

---

[1] The Clerk shall correct the spelling of the names of defendants on the docket.

[2] Shortly after defendants removed this case to this court from the Circuit Court for Howard County Maryland, plaintiff filed a motion for extension of time seeking a continuance for 90 days to permit him to locate and hire private counsel. ECF 7. This court denied that motion (ECF 8) and plaintiff filed an identical motion following the court's ruling (ECF 9). For the reasons stated in this court's prior order, the motion for extension of time (ECF 9) shall be denied.

and unknown persons. ECF 2. Because the complaint contains no allegations against Warden Armstead, the complaint will be dismissed as to her and as to "other unknown persons."

Plaintiff's claims concern an alleged failure to provide him with proper medical care for Hepatitis C and other disabilities. He alleges that prior to his incarceration, he was found to be disabled and awarded Social Security disability benefits "for specific physical disabilities, cardiovascular disease/disorder." ECF 2 at p. 4. He claims he is a "chronic care" patient with a history of cardiac problems, Hepatitis, chronic obstructive pulmonary disorder (COPD), mitral valve repair and two hernia surgeries. *Id.* He claims his disabilities prohibit him from heavy lifting, continuous standing or walking for more than one hour, climbing or balancing on uneven surfaces, weight lifting, and strenuous athletics. *Id.*

Plaintiff claims that both the medical staff and correctional staff have ignored the urgency of his medical situation and have failed to treat him for chronic Hepatitis C infection. He states this failure to provide treatment is a breach of the medical care contractor's contract with DPSCS. He further claims that the deliberate indifference of all defendants endangers his health and violates both his federal and state constitutional rights under the Eighth and Fourteenth Amendments. ECF 2 at p. 5.

Plaintiff adds that defendants failed to obtain medical records from the Tennessee Department of Correction or from the Office of Disability, Social Security Administration to establish that plaintiff has "health limitations" and to confirm his Hepatitis C infection. He further appears to aver that his poor health entitles him to the appointment of counsel in this case and that defendants failed to timely diagnose and treat him for Hepatitis C infection. ECF 2 at p. 5.

As relief plaintiff seeks injunctive relief requiring his treatment for Hepatitis C as well as monetary damages. ECF 2 at pp. 6 – 7.

Defendants Fayall and Danzillo are health service administrators who do not make medical decisions regarding the care of inmates in the custody of DPSCS. ECF 13 at Ex. 2, pp. 1 – 2. Notwithstanding this fact, defendants provide a summary of the care provided to plaintiff while he was in the custody of DPSCS.

Plaintiff's medical history includes asthma, gastroesophageal reflux disease ("GERD"), emphysema, COPD, inguinal hernia, and Hepatitis C. In addition, plaintiff has a history of anxiety and depression as well as drug and alcohol abuse lasting over 35 years. Plaintiff received a medical intake upon his arrival at Maryland Reception Diagnostic and Classification Center ("MRDCC") on May 19, 2014. At that time, he reported his medical history as including asthma, GERD, emphysema, inguinal hernia, hernia surgery, and a stent placement in 2006, but did not report that he was physically disabled or that he had Hepatitis C. ECF 13 at Ex. 2, p. 2.

On May 20, 2014, plaintiff's report of hernia discomfort was addressed by Taryn Adams-Harlee, R.N. Although plaintiff was observed walking to the medical room without assistance or difficulty, he reported his pain as an eight on a scale of one to ten, with ten being the worst pain. Plaintiff reported that he needed surgery to repair his hernia, prompting a referral to a mid-level medical provider the following day. Harlee gave plaintiff 600 mg of Motrin to address his pain. Plaintiff made no mention of Hepatitis C or having a disability during this encounter. ECF 13 at Ex. 2, p. 2.

The following day plaintiff was seen by Nurse Practitioner Grace Emaselalu for a health assessment. At that time plaintiff reported a history of heroin use, cocaine use, forty years of cigarette smoking (one pack per day), consumption of approximately one gallon of alcohol per

3

day prior to his arrest, and anxiety. He claimed the pain from his hernia had improved from the previous day and the examination revealed the hernia was stable. Plaintiff was also negative for dyspnea, cough or wheezing related to COPD. He was prescribed Naproxen for back pain and Zantac for GERD. Plaintiff was also placed on a list for chronic care clinic to monitor his various chronic medical issues. He did not report a physical disability or Hepatitis C to Emaselalu. ECF 13 at Ex. 2, p. 3.

On June 20, 2014, plaintiff was seen by Dr. Tewelde for a chronic care visit. Plaintiff told Tewelde that he wanted surgery for his hernia and threatened that if he did not get it, Tewelde would hear from plaintiff's lawyer. He further reported to Tewelde that he had an open heart mitral valve replacement in 2006, but had no heart issues since that time. At this appointment, plaintiff asked for the first time to be prescribed interferon for Hepatitis C. Because there was no record of plaintiff having Hepatitis C and his physical examination was negative for liver or spleen enlargement, Tewelde ordered lab work to test for Hepatitis C antibodies. ECF 13 at Ex. 2, p. 3.

On July 2, 2014, plaintiff was seen again by Tewelde regarding his hernia. Tewelde noted that the hernia was easily reducible and mild. He instructed plaintiff to avoid any heavy lifting and to avoid pressure building in his abdomen. ECF 13 at Ex. 2, pp. 3 – 4.

On July 15, 2014, plaintiff was admitted to the prison infirmary with diarrhea. His admission was a precaution taken in order to avoid possible spread of salmonella to other inmates. Three days later he was discharged from the infirmary and seen by Tewelde. At this appointment, plaintiff claimed he had the hernia since 2013 and wanted surgery on it now that he was in prison. He further stated that he had Hepatitis C for fifteen years and reported both

intravenous drug use and tattoos. Tewelde referred plaintiff to an infectious disease clinic for further examination and treatment and ordered a hernia belt for plaintiff. ECF 13 at Ex. 2, p. 4.

On July 25, 2014, plaintiff was transferred to the Metropolitan Transition Center (MTC). He was seen by Dr. Sunday Nwosu on August 8, 2014, for a surgical consultation for his hernia. The examination revealed the hernia was clinically stable. ECF 13 at Ex. 2, p. 4.

On August 14, 2014, plaintiff was sent to Bon Secours Hospital for right inguinal hernia repair, which he tolerated well. Plaintiff was discharged in stable condition and returned to MTC, where he was admitted to the infirmary so he could be monitored. When plaintiff was discharged from the infirmary on August 21, 2014, it was noted that the surgical site was healing well and plaintiff was able to walk without assistance. He was provided a medical assignment indicating he could not lift weight. Five days later, plaintiff was provided with a medical order for a bottom bunk assignment. ECF 13 at Ex. 2, pp. 4 – 5.

On September 9, 2014, plaintiff was seen by Nwosu for chronic care clinic visit. It was noted in regard to his Hepatitis C, that plaintiff was not experiencing nausea or vomiting and was not jaundiced. Plaintiff told Nwosu that he would be receiving a parole hearing in a month. Nwosu noted that after plaintiff's parole hearing it could be determined if plaintiff "had sufficient time in prison to begin interferon treatment." ECF 13 at Ex. 2, p. 5.

On October 9, 2014, plaintiff was again seen by Nwosu for chronic care. Plaintiff stated he was not sure of his release date, but had a paper with him indicating his release would be in 2016. Nwosu noted that plaintiff's history of alcohol abuse had comprised his liver and referred plaintiff to the infectious disease clinic for evaluation of his candidacy for antiviral treatments for Hepatitis C. ECF 13 at Ex. 2, p. 5.

On January 9, 2015, plaintiff, then housed at Patuxent, was seen by Nurse Practitioner Lum Maximuangu. At that time it was noted that plaintiff's liver function tests were normal and that his Hepatitis C was asymptomatic. He denied weight loss, fatigue, and abdominal pain. Plaintiff was advised regarding diet, exercise, and compliance with his overall plan of care. ECF 13 at Ex. 2, p. 5.

On March 31, 2015, plaintiff was seen by Dr. Andrew Moultrie for a chronic care clinic visit regarding Hepatitis C. Moultrie noted that plaintiff did not have enough time remaining on his sentence to begin antiviral therapy pursuant to the policy of DPSCS. Plaintiff stated understanding the decision and denied any symptoms related to Hepatitis C at that time. ECF 13 at Ex. 2, p. 5.

On June 29, 2015, Moultrie saw plaintiff again for a chronic care visit at which time plaintiff denied complaints including nausea, pruritus, jaundice, abdominal pain, bruising, and swelling. Moultrie again advised plaintiff that there was insufficient time left on his sentence to qualify for antiviral therapy. Plaintiff was transferred to BCCC on August 18, 2015. ECF 13 at Ex. 2, pp. 5 – 6.

On August 20, 2015, plaintiff was seen by Tewelde for a chronic care clinic visit. At that time plaintiff complained of back and neck pain he attributed to a prison assault that occurred at Patuxent one month earlier. Five days later Tewelde updated plaintiff's medical chart and noted plaintiff would be provided a vaccine for Hepatitis A and B called Twinrix. On August 27, 2015, plaintiff was seen by Tewelde to receive the first of three Twinrix vaccines. The second dose would be provided in one month and the third dose in six months. ECF 13 at Ex. 2, p. 6. Plaintiff received the second dose on September 28, 2015, and the third dose on February 28, 2016. *Id.* at p. 7.

On September 9, 2015, plaintiff was seen by Dr. Dolph Druckman for a chronic care visit. At that time plaintiff was complaining he was not receiving medication for his back pain. Plaintiff had provided staff with "profuse paperwork documenting his Social Security disabled status" and claimed chronic lower back pain that "affected getting out of bed in the morning." Dr. Druckman noted, however, that plaintiff also reported no difficulties in performing activities of daily living and had no apparent difficulty transferring from a chair to the examination table. Additionally, plaintiff's gait was fluid and physical examination showed mild tenderness in his back. Based on his examination, Druckman concluded that plaintiff was fit for sedentary work and prescribed Naproxen for his discomfort. ECF 13 at Ex. 2, pp. 6 – 7.

The DPSCS policy regarding Hepatitis C which was in place during plaintiff's incarceration provided that an inmate with less than twenty-four months to serve before their release is not eligible to begin anti-viral therapy, including interferon. This is due to the fact that the primary anti-viral treatment within DPSCS requires regular shots over a forty-eight week period of time and missing a single dose can render the entire treatment ineffective. ECF 13 at Ex. 2, pp. 7 – 8.

### Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## Analysis

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate

consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

The complaint does not allege that the defendants named participated in decisions regarding plaintiff's medical care, nor is there any evidence that plaintiff had a disability that was not properly accommodated. There are no allegations against Warden Laura Armstead and defendants Fayall and Danzillo are simply named in the caption of the complaint without specific allegations against them. It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a Bivens suit). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984).

Moreover, the verified medical records and declaration under oath by Dr. Druckman establishes that plaintiff received constitutionally adequate medical care. Thus, even if the complaint had named persons directly involved in decisions regarding plaintiff's medical care, those defendants would be entitled to summary judgment in their favor. Summary judgment will be granted in favor of defendants Fayall and Danzillo and shall be dismissed as to defendant Laura Armstead.

_____
Date

_____
J. Frederick Motz
United States District Judge

10